(No. 89-CC-3635-)

DONALD SICKLES, Claimant, *v.* THE STATE OF ILLINOIS,
Respondent.

*Opinion filed May 13, 1994.*

APPLETON & MCHUGH (GREGORY J. MCHUGH, of
counsel), for Claimant.

ROLAND W. BURRIS, Attorney General (CHRISTO-
PHER K. WELLS, Assistant Attorney General, of counsel),
for Respondent.

## OPINION

FREDERICK, J.

Claimant filed his complaint in the Court of Claims
on June 2, 1989, seeking damages for alleged damage to a
well of Claimant by the Illinois Department of Trans-
portation during the construction of Highway 34. The case
was tried before the Commissioner assigned to the case.

Claimant, Donald Sickles, is a farm owner, possess-
ing land in Warren County, Illinois, approximately one
mile from Monmouth, Illinois. Claimant has owned the
land which is the subject of this litigation since 1972. At
the time of purchase, Claimant testified that the land
contained four working wells.

In 1976, the Respondent, through the State of Illinois
Department of Transportation, entered into negotiations

to purchase a right-of-way for road project 404 from Claimant. The completed project is now known as Highway 34. The road project encompassed land contained within the boundaries of that owned by Claimant. Claimant's land is both north and south of the highway project. On April 9, 1976, negotiations were completed between Claimant and Respondent after which both parties entered into a contract for warranty deed and temporary easement. The negotiated price was $33,500 for the easement. The parties signed the agreement. Among the terms of the "Receipt for Warranty Deed and Temporary Easement" was incorporated the language which gives rise to this claim, "In the event that the well adjacent to the ROW (right-of-way) is adversely affected during or as a result of construction damages will be paid for same by the department." This language was incorporated into the agreement because Mr. Sickles had concerns his well might be damaged as it was close to the construction. The allegedly damaged well, referred to as well number 2 by the parties, is approximately 36 feet off the right-of-way purchased by the State.

Claimant testified to the existence of two distinct wells contemplated by the contract. These wells were most likely developed when coal miners lived in the area. Well number 2 allegedly fell within the actual area under construction and was lost to construction, according to Claimant. Illinois Department of Transportation Cite Engineer David Clark was in charge of this section of construction. Mr. Clark oversaw construction in the area. The area where well number 1 allegedly existed was given close work and attention because of old tires and debris in the vicinity. This work was done by bulldozers. According to Mr. Clark, no well was ever encountered in the right-of-way over which the highway now runs. Mr. Clark testified that had a well been located in the highway's right-of-

way, it would have been brought to his attention so that special construction precautions could be taken. Mr. Clark also testified that the excavation of earth in that area was completed between July and October, 1984.

According to Claimant, well number 1 was a main well with good water that Claimant used for spraying on the farm. It was a stone well over 25 feet deep. Well number 2 was stone but not as deep. Construction of the road started in the late 1970s and into the 1980s. Claimant testified that when well number 2 was covered over by the road that well number 2 almost immediately lost its water. He testified that prior to construction the well always had water but afterwards it was dry.

Gordon Benson also testified for the Respondent. Mr. Benson was a former I.D.O.T. employee, having retired in 1983. Mr. Benson testified that he had begun his I.D.O.T. employment as an assistant to the district soils engineer, later becoming foundation engineer and chairman of the State Soils Committee. He incorporated his background education in geology and worked on related problems in various I.D.O.T. districts. In regard to his knowledge of wells, witness Benson testified that he had done considerable work on problems of seepage and internal drainage and had personally inspected well number 2.

Mr. Benson indicated that well number 2 was approximately 36 inches in diameter and measured 12 feet deep. The well was located on a ridge and was hand dug and hand laid with limestone. The well was not covered which could allow an accumulation of foreign material resulting in the well becoming shallow to the point of being above the water table. Mr. Benson indicated that he believed the well to be approximately 90 years old and long abandoned when he observed the well.

Prior to construction, I.D.O.T. generated a cross section survey of the land in question. The cross section established a centerline for the survey along the area that was relevant in the building of the improvement. The cross sections represent a vertical slice down through the ground extending to either side of the center line of the survey. The cross section shows the character of the ground in a traverse direction to the roadway, demonstrating what the surface of the ground looked like along the centerline of the roadway surveyed. Mr. Benson testified to the approximate location of well number 2 and indicated no earth was moved within 80 feet of the well.

The centerline profile is a soil survey. The centerline profile indicates that holes were made at intervals of 100 feet alternating from the left to the right of the proposed centerline with each hole approximately 44 feet out from the centerline. These borings extend well below the depth of the improvement to see what types of soils will serve as the foundation for the roadway. The ground water level at the approximate site of the Claimant's well in 1975 was 714 feet above sea level. The bottom of the Claimant's well did not extend below 729 feet above sea level. These measurements were made in 1975 when the area had experienced an excessively wet period. Mr. Benson testified that an excessive amount of precipitation would affect ground water levels by raising the water table.

Alternatively in 1987, the approximate time Claimant's well was alleged to have dried up, the Monmouth area was approximately 10 inches below the average annual precipitation level. Mr. Benson testified that the lack of precipitation very definitely could cause a well to go dry. Mr. Benson also testified that the ground water could once again be reached by merely digging a 20-foot-deep well.

Claimant called as his witness water driller Roger

Acker. Mr. Acker testified that he personally inspected well number 2. The well appeared to be approximately 15 feet deep containing roughly 2-3 feet of water on the date of inspection. Mr. Acker testified that it was "possible" that cutting the angle of the hill down could have disturbed the natural water flow, but he had no knowledge of the land prior to the excavations. Mr. Acker also acknowledged that he was merely stating a general principle, that excavation resulted in a change in water flow. Mr. Acker indicated that the well was hand dug and fed by ground water, very possibly percolating from the north from a vein of sand. He also testified that in 1988 he experienced an increase in his local well-digging business as a result of drought. However, Mr. Acker testified that it is more likely true than not that well number 1 and well number 2 were connected by the water table.

As a replacement for the allegedly damaged 15-foot-deep well number 2, Mr. Acker proposed drilling a 200-foot-deep well at $15 per foot and attaching a pump for $1,350. This proposed well could produce 8-10 gallons of water per minute. Well number 2 had previously been used only sparingly for water to mix with chemicals and spray on crops or for providing Claimant's cattle with a secondary source of water when an adjacent creek went dry. Mr. Acker testified that a decrease in rainfall will often cause more shallow wells to go dry.

The evidence is clear that prior to the construction of Highway 34, Claimant had a working well on his land, known as well number 2. Claimant was concerned enough about the proximity of this well to the construction project that he asked for and received contract language drafted by Respondent that stated if the well is *adversely affected during or as a result of construction*, damages would be paid for same by Respondent.

The issue in the case is whether well number 2 was adversely affected during or as a result of construction. While there are questions about the existence of well number 1, there is no question concerning the existence of well number 2. There is also no question that well number 2 had water in it prior to the construction and during the construction was adversely affected by going dry. We find that it is more probable than not that the damage was caused by the construction and resulting change in the land than by a drought or because of the natural water table. The broad contract language allows for a recovery by Claimant as this language must be construed least favorably to the Respondent as they drafted the contract. *McDonnell-Douglas Automation v. State* (1983), 36 Ill. Ct. Cl. 46.

The issue of damages, however, is not as clear. Well number 2 was a 15-foot hole and only provided a small amount of water for limited agricultural purposes. The damages to this very old well are not properly measured by paying for a 200-foot well requiring a $1,350 or more pump. Mr. Benson testified ground water could be reached by digging down 20 feet. Such a remedy of finding ground water would put this well in the same condition it was in prior to the construction. By using the formula of Mr. Acker and giving some leeway for the time that has passed since the well went dry and the need to dig deeper than 20 feet, we would believe that an award of $640 is appropriate under the facts of this case.

Based on the foregoing, Claimant, Donald Sickles, is hereby awarded the sum of $640 in full satisfaction of his claim.